Rocco J. FIORENTINO, Appellant,

v.

Frank RAPOPORT, Alan Gordon and Saul, Ewing, Remick & Saul.

Rocco J. FIORENTINO,

v.

Frank RAPOPORT, Alan Gordon and Saul, Ewing, Remick & Saul, Appellants.

Superior Court of Pennsylvania.

Argued Dec. 4, 1996.

Filed March 20, 1997.

Reargument Denied May 22, 1997.

Stuart Fiel, Philadelphia, for Fiorentino.

Seymour I. Toll, Philadelphia, for Rapoport, Gordon and Saul, Ewing, Remick & Saul.

Before CIRILLO, President Judge Emeritus, HOFFMAN, J. and CERCONE, President Judge Emeritus.

CERCONE, President Judge Emeritus:

This is a consolidated appeal and cross-appeal from the final judgment entered after the trial court denied post-trial relief to both the plaintiff and the defendants in a legal malpractice case. Appellant Rocco J. Fiorentino instituted the suit underlying this appeal by filing a complaint against cross-appellants Frank Rapoport, Alan Gordon, and

the law firm of Saul, Ewing, Remick & Saul. Thomas Rutter, Esquire, sitting as Judge Pro Tem, granted a compulsory nonsuit in favor of defendants and final judgment was entered on December 13, 1995. For the reasons that appear below, we reverse and remand for a new trial.

The Honorable Frederica A. Massiah-Jackson has aptly summarized the factual history of the case in the following manner:

In 1975, the plaintiff, Mr. Fiorentino, went into business with John Converse, establishing a company called J & R Equipment Services ("J & R"). At the time, Mr. Fiorentino was 19 years old, Mr. Converse was 29, and the two individuals knew each other, as Mr. Converse had been Mr. Fiorentino's supervisor at another company. Mr. Fiorentino and Mr. Converse began J & R with approximately $300 each in startup capital, and the business specialized in servicing restaurant equipment, installing serviced equipment for manufacturers, selling equipment, leasing equipment and designing and drafting equipment.

In 1978, J & R incorporated, and Mr. Fiorentino and Mr. Converse were each issued 2,500 shares of stock in the company. By this time, J & R had established many national accounts, servicing such restaurants as Pizza Hut, Friendly's and McDonalds. During the ten years of J & R's operation, the business yielded approximately $3.5 million in gross revenues.

In November, 1985, Mr. Fiorentino and Mr. Converse decided to terminate their business relationship. Pursuant to this decision, the plaintiff and Mr. Converse agreed between themselves that: (1) Mr. Fiorentino would receive the stock in Leasomatic, a smaller company started by J & R; (2) Mr. Converse would keep J & R; and (3) Mr. Fiorentino would receive $1.1 million in payments over a ten year period, payable in monthly installments of $9,166.67 as J & R received 20-5/6 of the company's shares belonging to Mr. Fiorentino on a monthly basis. Mr. Fiorentino and Mr. Converse then enlisted the services of Mr. Frank Rapoport ("Mr. Rapoport") and Mr. Allen Gordon ("Mr. Gordon"), partners at Saul, Ewing to put the terms of their mutual agreement in writing. [*See*] Stock Purchase Agreement by and among John D. Converse, Rocco J. Fiorentino, J & R Equipment Service, Inc. and Leasomatic, Inc. ("Stock Purchase Agreement"). All parties met on at least two separate occasions during the course of memorializing the agreement.

At trial, Mr. Gordon described the details and the effect of the agreement and the transaction as follows:

(1) the money owed to Mr. Fiorentino was to be paid by J & R if it had the surplus to pay it; otherwise, it was to be paid by Mr. Converse;

(2) every month J & R would receive 20-5/6 shares of stock from Mr. Fiorentino;

(3) at the end of the transaction, Mr. Converse would own the 2500 outstanding shares of J & R, with Mr. Fiorentino's stock becoming treasury stock;

(4) the stock to be returned monthly was to be held in escrow by Mr. Converse, thus giving him the power to vote all shares of stock;

(5) upon default, Mr. Converse would deliver to Mr. Fiorentino all shares held in escrow not redeemed by J & R and Mr. Fiorentino would become a 50-50 shareholder;

(6) Mr. Converse was able to vote the shares of J & R and vote the company out of business and into bankruptcy; and

(7) payments to Mr. Fiorentino depended on the net worth of J & R and if this was deficient, Mr. Converse became responsible for payments.

*See* Stock Purchase Agreement, ¶¶ 1-5.

During the meetings, there was no discussion relating to what would happen in the event that a default in payment occurred, nor was there discussion relating to potential conflicts of interest or the pursuit of independent counsel for each party to the agreement. Furthermore, the defendants never advised the parties about the possibilities and virtues of establishing

an independent escrow arrangement. Finally, there was no discussion of a provision to preclude Mr. Converse from establishing a corporation with transferred J & R assets that would be owned by his family members. The Stock Purchase Agreement was finalized and signed on January 2, 1986.

For the first thirteen months after the finalization of the agreement, Mr. Fiorentino received $9,166.67 per month pursuant to the agreement's terms. However, in February, 1987, Mr. Converse conveyed to Mr. Fiorentino that he could no longer make the full payments, and the two parties agreed to amend temporarily the Stock Purchase Agreement to reflect a reduction in the amount due and payable to Mr. Fiorentino. After an unsuccessful attempt to contact Mr. Gordon at [the] Saul, Ewing offices, Mr. Fiorentino contacted Mr. Bert Martin ("Mr. Martin"), a New Jersey attorney from the law firm Martin, Crawshaw & Mayfield, to draft an addendum to the Stock Purchase Agreement. Pursuant to the addendum, Mr. Fiorentino received $5,500 per month in payments from J & R.

Simultaneously, Mr. Rapoport, pursuant to Mr. Converse's request, established and incorporated Ice Systems of New Jersey and Food Service Equipment Contractors ("Food Service"). These two corporations were not owned by Mr. Converse, but instead, Ice Systems was 65% owned by his wife and his son with 35% of it owned by the employees, and Food Service was 65% owned by his wife and daughter with the employees owning the rest. Mr. Converse served as president of both corporations. The $5,500 per month payments continued for the next twelve months, until Mr. Converse notified Mr. Fiorentino by letter dated February 8, 1988, that he would no longer make further payments under the agreement.

Thereafter, Mr. Converse voted the J & R stock and signed the authorization for the company to go into bankruptcy. On April 5, 1988, Mr. Converse filed a voluntary bankruptcy petition on behalf of J & R in the United States District Court of New Jersey.

Trial Court Opinion dated 12/5/95 at 5–9 (citations to notes of testimony and footnotes have been omitted).

Mr. Fiorentino initiated suit in the United States District Court for the Eastern District of Pennsylvania against John D. Converse, Kathleen Converse, John T. Converse, Maureen Converse, Rick Fargo, Cindy DiFazio, Ice Systems of New Jersey, Inc., Food Service Equipment Contractors, Inc., Frank Rapoport, Alan Gordon, and Saul, Ewing, Remick & Saul.

> However, the District Court dismissed the action on the grounds that the conduct alleged in the plaintiff's complaint did not constitute a pattern of racketeering activity under the RICO statute. *See Fiorentino v. Converse, et al.,* 705 F.Supp. 253, 255 (E.D.Pa.1989), *aff'd,* 884 F.2d 1383 (3d Cir. 1989). *See also* Order for Civil Action No. 88–5065, filed September 7, 1989 (Plaintiff's Motion for Reconsideration denied), *aff'd, Fiorentino v. Converse, et al.,* No. 89 Civ. 1791, 898 F.2d 140 (3d Cir. Feb 8, 1990) (no abuse of discretion for the District Court not to consider belatedly presented depositions on motion to reconsider where those depositions were available when the case was pending in the District Court originally).

Trial Court Opinion dated December 5, 1995 at 2 n. 2. On March 28, 1989, Mr. Fiorentino then filed the complaint underlying this appeal in the Court of Common Pleas of Philadelphia County. The state court action named as defendants only Messrs. Rapoport and Gordon, and the law firm of Saul, Ewing, Remick & Saul ("Saul Ewing"). The complaint alleged that the defendants were liable to Mr. Fiorentino under three separate theories: (1) breach of contract; (2) legal malpractice stemming from negligence; and (3) breach of fiduciary duty.

A jury trial was conducted in September of 1993 before Thomas Rutter, Esquire, sitting as Judge Pro Tem. On the fourth day of trial, Judge Pro Tem Rutter granted a defense motion for compulsory nonsuit and dismissed the case with prejudice. *See* Order docketed 9/23/93. Judge Pro Tem Rutter explained that the sole basis for his ruling

was that Mr. Fiorentino had failed to show "proof as to harm." N.T. 9/21/93 at 777. Mr. Fiorentino filed a motion for post-trial relief on September 30, 1993. Defendants' cross-motion for post-trial relief followed on October 12, 1993. Judge Massiah–Jackson and Judge Pro Tem Rutter entered a joint order on December 5, 1995 denying all post-trial motions. On the same date, Judge Massiah–Jackson filed an opinion explaining the rationale behind the order denying post-trial relief. Final judgment was entered December 13, 1995 and the instant timely appeals followed.[1]

Mr. Fiorentino, appellant, has presented two claims for our consideration:

A. Should a legal malpractice plaintiff be required to demonstrate with absolute certainty what would have happened in circumstances that the defendant lawyers did not permit to come to pass by their actions and omissions?

B. Is the granting of compulsory nonsuit proper where plaintiff's expert provided an opinion as to all relevant elements of the cause of action based upon testimony and documents of record?

Appellant's Brief at 3. Cross-appellants, Mr. Rapoport, Mr. Gordon and Saul Ewing, raise one question:

In a legal malpractice case based on attorneys' negligent preparation of commercial documents, does the two-year statute of limitations begin to run when there is a default under the documents, plaintiff retains another attorney with whom he reviews the documents, and plaintiff, acting on the advice of his new attorney, agrees to modify the documents?

Brief for Appellees/Cross–Appellants at 1.

Before addressing the substance of these claims, we note that a motion for compulsory nonsuit allows a defendant to test the sufficiency of a plaintiff's evidence. *Poleri v. Salkind*, 453 Pa.Super. 159, 166, 683 A.2d 649, 653 (1996). A judge or jury cannot be permitted to reach a decision on the basis of speculation or conjecture. *Biddle v. John-*

*sonbaugh*, 444 Pa.Super. 450, 455, 664 A.2d 159, 161 (1995). However, the lack of evidence to sustain the action must be so clear that it admits no room for fair and reasonable disagreement. *Gregorio v. Zeluck*, 451 Pa.Super. 154, 158, 678 A.2d 810, 812, *appeal denied*, 546 Pa. 681, 686 A.2d 1311 (1996). Thus, a judgment of nonsuit may be entered only if, after viewing all the evidence and all reasonable inferences from that evidence in the light most favorable to the plaintiff, the factfinder could not reasonably conclude that the elements of a cause of action have been established. *Long v. Manzo*, 452 Pa.Super. 451, 456, 682 A.2d 370, 373 (1996). The facts must be so clear that reasonable persons could not differ about the finality of their evidentiary significance. *Id.* On appeal, we must resolve any conflicts in the evidence in favor of the plaintiff. *Gregorio*, 451 Pa.Super. at 158, 678 A.2d at 813.

In Pennsylvania, an individual who has taken part in an attorney-client relationship may sue his attorney for malpractice under either a trespass or assumpsit theory, each of which requires the proof of different elements. *Guy v. Liederbach*, 501 Pa. 47, 55, 459 A.2d 744, 748 (1983). In a trespass action alleging legal malpractice concerning a civil matter, the plaintiff must establish three elements in order to recover: (1) the employment of the attorney or other basis for duty; (2) the failure of the attorney to exercise ordinary skill and knowledge; and (3) that the attorney's failure to exercise the requisite level of skill and knowledge was the proximate cause of damage to the plaintiff. *Bailey v. Tucker*, 533 Pa. 237, 246, 621 A.2d 108, 112 (1993). *Accord McMahon v. Shea*, —— Pa. ——, 688 A.2d 1179 (1997). These elements must be proven by a preponderance of the evidence. *McPeake v. William T. Cannon, Esquire, P.C.*, 381 Pa.Super. 227, 232, 553 A.2d 439, 441 (1989). An attorney will be deemed "negligent" if he or she fails to possess and exercise that degree of knowledge, skill and care which would normally be exercised by members of the profession under the same or similar circumstances. *Collas v. Garnick*, 425 Pa.Super. 8, 13, 624 A.2d 117,

---

1. Appellant Fiorentino filed his notice of appeal on December 22, 1995. Cross-appellants Rapo-port, Gordon and Saul Ewing filed their notice of appeal on January 5, 1996.

120, *appeal denied,* 535 Pa. 672, 636 A.2d 631 (1993); *Composition Roofers Local 30/30B v. Katz,* 398 Pa.Super. 564, 568, 581 A.2d 607, 609–10 (1990); *ei bon ee baya ghananee v. Black,* 350 Pa.Super. 134, 140, 504 A.2d 281, 284 (1986).

▮▮▮ By way of comparison, an assumpsit claim based on breach of an attorney-client agreement is a contract claim, and the attorney's liability must be assessed under the terms of the contract. *Bailey v. Tucker,* 533 Pa. at 251, 621 A.2d at 115. Thus, if the attorney agrees to provide his or her best efforts and fails to do so, an action in assumpsit will accrue. *Id.* "[A]n attorney who agrees for a fee to represent a client is by implication agreeing to provide that client with professional services consistent with those expected of the profession at large." *Id.* at 251–52, 621 A.2d at 115. *See also Maritrans v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 253, 602 A.2d 1277, 1283 (1992) (Pennsylvania law "imposes on attorneys the status of fiduciaries *vis a vis* their clients; that is, attorneys are bound, at law, to perform their fiduciary duties properly.").[2]

In this case, the parties agree that Mr. Fiorentino was a client of the cross-appellants. They also agree that he and Mr. Converse engaged the cross-appellants specifically to provide legal advice and to prepare the documents necessary to effectuate the sale of Mr. Fiorentino's interest in J & R to Mr. Converse. Cross-appellants' argument effectively concedes, at least *arguendo,* that they failed to exercise ordinary skill and knowledge in handling this transaction. As discussed more fully below, our study of the certified record has convinced us that Mr. Fiorentino met his burden of proof regarding this point. *See generally* N.T. 9/20/93 at 510–618 (direct testimony of Bennett J. Wasserman, Esquire). We therefore do not rely on the manner in which cross-appellants have phrased their argument as the basis for our

determination regarding the caliber of the legal services provided.

▮▮▮ A lawyer is not required to be infallible; however, he or she is expected to conduct that measure of research sufficient to allow the client to make an informed decision. *Collas v. Garnick,* 425 Pa.Super. at 13, 624 A.2d at 120. In order to advise a client adequately, a lawyer is obligated to scrutinize any contract which the client is to execute and thereafter must disclose to the client the full import of the instrument and any possible consequences which might arise therefrom. *Id. See McMahon,* —— Pa. at ——, 688 A.2d at 1182 (a lawyer has a duty to inform his or her client of all relevant considerations before the client enters into and signs a complex legal agreement).[3] The lawyer "must be familiar with well settled principles of law and the rules of practice which are of frequent application in the ordinary business of the profession." *Collas,* 425 Pa.Super. at 13–14, 624 A.2d at 120.

In this case, the plaintiff's expert, Bennett J. Wasserman, Esquire, testified that an obvious conflict of interest exists when one law firm tries to represent both the buyer and the seller in a complex sales transaction. The witness explained that in this case, Mr. Fiorentino's desire for security with regard to payments was diametrically opposed to Mr. Converse's preference to remain untrammeled in his management of J & R. Mr. Wasserman stated that it was impossible for the cross-appellants to simultaneously fulfill their required fiduciary duty to both of these clients. N.T. 9/20/93 at 521–28, 568–73; N.T. 9/21/93 at 725–727. The witness' subsequent testimony indicated that Mr. Fiorentino's interests were sacrificed to promote those of Mr. Converse.

The expert detailed the "basic forms of protection" which were lacking from Mr. Fiorentino's point of view, as well as the manner in which the documents prepared by

**2.** We note that *Maritrans* examines both conflicts of interest and breach of fiduciary duty in the context of a legal malpractice suit. As fully explained *infra,* the certified record clearly indicates that the compulsory nonsuit was not granted on the grounds that Mr. Fiorentino failed to establish the elements of breach of fiduciary duty. Neither Judge Pro Tem Rutter nor Judge Massiah-Jackson addressed this question. Fur-

thermore, the parties to the instant appeal have mentioned the point only tangentially. We therefore see no need to discuss the elements of breach of fiduciary duty in any detail.

**3.** Mr. Fiorentino testified that he never received this required disclosure. N.T. 9/14/93 at 323–327.

the defendants were "slanted" in favor of Mr. Converse. N.T. 9/20/93 at 544–76. Among other things, the transaction was structured so that Mr. Converse held all of the stock and exercised voting control over it despite the fact that he had yet to pay for it.[4] Furthermore, the terms of the contract of sale were not phrased to prevent Mr. Converse or any of his family members from going into a competing business with J & R, the source of the funds to pay Mr. Fiorentino. *Id.* 549–54, 559. Most important, nothing prohibited Mr. Converse from transferring assets from J & R to his family members or to closely held corporations owned by family members. *Id.* at 564–66.[5] Thus, nothing in the agreement of sale interfered with Mr. Converse's ability to lawfully force J & R into bankruptcy. *See also* N.T. 9/20/93 at 620–33 (in camera examination of expert witness concerning defendants' deviations from standard of care expected in the proper performance of legal duties by an attorney engaged to draft a written agreement for the sale of a business enterprise).

The contract of sale specified that Mr. Converse would be personally liable to Mr. Fiorentino in the event that J & R could no longer make the payments. N.T. 9/20/93 at at 549. Mr. Wasserman testified that to effectuate this provision, it was necessary to involve Mr. Converse's wife as a co-guarantor of the obligation. *Id.* at 576. Otherwise, Mr. Converse could lawfully transfer assets from his personal control to the marital unit. Thus he could enjoy the benefit of the assets while making himself personally "judgment proof." *Id.* at 565–66, 576. According to Mr. Wasserman, the appropriate clauses to prevent all of these problems are missing from the agreement of sale drafted by the defendants even though such language is readily available in contract law "form books" which are "standard throughout the country." *Id.* at 530–31, 546–48.

Our standard of review requires us to interpret the above evidence in the light most favorable to the plaintiff. *Long v. Manzo, supra.* We find that Mr. Wasserman's expert testimony was sufficient, if believed by the factfinder, to prove that the cross-appellants failed to exercise the ordinary skill and knowledge expected of a lawyer engaged to prepare a contract for the sale of a business. This evidence thus satisfied the second prong of the standard articulated in *Bailey v. Tucker, supra* regarding a malpractice claim sounding in trespass. Mr. Wasserman's testimony also supports Mr. Fiorentino's contract claim to the extent that it indicates the defendants did not provide their client with "professional services consistent with those expected of the profession at large." *Id.*, 533 Pa. at 251–52, 621 A.2d at 115. We are cognizant of cross-appellants' argument that with a legal malpractice claim sounding in assumpsit, the plaintiff must show that the defendant attorney failed to follow the client's instructions. *See, e.g., Rogers v. Williams*, 420 Pa.Super. 396, 401, 616 A.2d 1031, 1033 (1992). However, we find that this element of a contract claim has also been met. Mr. Fiorentino testified that he told the defendants that his primary concern was receiving all the money owed to him for the sale of his interest in J & R. Furthermore, Mr. Fiorentino testified that he specifically instructed the defendants that he wanted them to draft the agreement of sale "to make sure that I got paid." N.T. 9/14/93 at 321.

The trial judge's stated reason for granting a compulsory nonsuit was that Mr. Fiorentino failed to prove "harm." Thus, the next question is whether the cross-appellants' failure to follow Mr. Fiorentino's instructions and to exercise ordinary "skill and knowledge" was the proximate cause of the damage he claims to have suffered. It is

---

4. Mr. Wasserman explained that a third-party escrow arrangement for stock transfers is a common method which would have been preferable in this case because it would have protected Mr. Fiorentino while still permitting Mr. Converse to run J & R. N.T. 9/20/93 at 537–540, 547–48. As noted by the trial court, Mr. Converse served as the escrow agent and held voting rights over the escrowed stock. Trial Court Opinion at 7. *See*

*also* N.T. 9/13/93 at 166–185 (testimony of Alan Gordon).

5. The post-trial motions judge correctly noted that the "asset migration" in this case involved the use of closely held corporations predominantly owned by Mr. Converse's wife and children. *See* Trial Court Opinion at 9.

beyond cavil that whether the allegation that an attorney has breached his or her professional obligations to a client is denominated in trespass or assumpsit, an essential element of the cause of action is proof of actual loss. *Rizzo v. Haines*, 520 Pa. 484, 504, 555 A.2d 58, 68 (1989); *Mariscotti v. Tinari*, 335 Pa.Super. 599, 601, 485 A.2d 56, 57 (1984).

> The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence. The test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages. Thus, damages are speculative only if the uncertainty concerns the *fact* of damages rather than the amount.

*Rizzo*, 520 Pa. at 504–05, 555 A.2d at 68 (emphasis in the original; quotations and citations omitted).

In this case, the parties do not dispute the fact that $914,833.29 remains to be paid under the terms of the contract of sale for J & R. *See* Trial Court Opinion at 11. Nevertheless, both the trial judge and the post-trial motions judge concluded that Mr. Fiorentino failed to demonstrate that he suffered "actual loss" within the meaning of Pennsylvania case law because Mr. Converse had already declared bankruptcy on behalf of J & R by the time the predecessor law suit was filed in federal court. Mr. Fiorentino argues that in reaching this conclusion, both trial court judges have confused the plaintiff's duty to establish proximate causation with the question of whether sufficient assets existed at the time of the original federal law suit to satisfy a judgment against Mr. Converse or J & R.

The thrust of this argument is that the trial court should not have focused on whether the underlying debt was "collectible" at the time of the federal suit. According to Mr. Fiorentino, the proper question is twofold: (1) did J & R control sufficient resources to cover the buy-out liability at the time the agreement of sale was executed; and (2) did J & R ultimately lack the resources to continue functioning as the source of funds to pay Mr. Fiorentino because the cross-appellants failed to include protective clauses in the agreement of sale that would have prevented the transfer of assets to Mr. Converse's spouse and children? In other words, was it the inadequate quality of the defendants' legal services that permitted the transformation of a reasonably funded corporate liability into an uncollectible debt? [6]

The post-trial motions judge explained that the judge pro tem justifiably granted the defendants' motion for compulsory nonsuit on the following grounds:

> [I]t is not clear from the evidence that Mr. Fiorentino would have recovered [$914,833.29]. By the time Mr. Fiorentino filed his initial suit in federal court based on the default in payments to him, Mr. Converse had already filed bankruptcy on behalf of J & R. As well, there was no indication of potential growth for the company since by June, 1988, J & R had no customers, was not in business, and all J & R equipment and other assets, as well as the service end of its business, had been transferred to Ice Systems, Inc. and Food Service Equipment Contractors. This evidence, at best, indicates that J & R's assets and customer base had deteriorated and that Mr. Fiorentino hardly would have recovered the full amount owed to him.
>
> Moreover, Plaintiff presented no evidence relating to the value of J & R at the time that the alleged loss was sustained. The testimony given by Plaintiff's expert focused on J & R's financial status in 1985. It was offered to illustrate the resources that Saul, Ewing should have used to secure Mr. Fiorentino's position, and further,

---

6. We wish to emphasize that in this appeal, Mr. Fiorentino does not contend that Mr. Converse violated the law by making the asset transfers or that Mr. Converse breached the terms of the contract of sale in this regard. Despite the convoluted attempts of cross-appellants to confuse this issue, the crux of Mr. Fiorentino's complaint is that Mr. Converse should not have been able to lawfully render himself and J & R "judgment proof" and that he could not have done so if defendants' legal services had been in conformity with the standards expected of Pennsylvania practitioners.

to show that the failure to do this was negligent and a breach of contractual and fiduciary duties. These numbers are relevant only for 1985 and not for 1988, the time of the alleged loss. Finally, the only indication of J & R's value at the time of default was the bankruptcy petition filed on behalf of J & R, which showed its value to be $7,500. However, this evidence was not presented to the jury, and was only elicited in an in-camera examination of Mr. Fiorentino's expert.

Because the evidence presented was not concrete with respect to J & R's value, it was insufficient to permit the jury to determine that any damages were sustained by Mr. Fiorentino.

Trial Court Opinion at 11–12.

It is thus clear that the post-trial motions judge melded the separate considerations of proximate causation, quantification of damages, and collectibility into one issue. The record is equally clear that the judge pro tem was confused on the same points.

Whether viewed as a breach of contract case, or as a deviation from the standard of care negligence case, or a breach of fiduciary relationship case, it is required that the plaintiff prove a number of elements, included in which is proof of damages. . . .

In this case I have permitted the testimony of the expert to the effect that the deviations of the standard of care were a substantial factor in causing injury to Mr. Fiorentino, the plaintiff. . . . Rhetorically, the question might well be, what proof is there here except that Plaintiff did not get paid.

In answer to that question, Mr. Fiel offers to me the bankrupcy [sic] petition, which shows a net equity position of about $7,500.00 on J & R two months after the default in 1988.

And he refers me to the Ice Systems financial statement, which shows, as of September 30, 1988, a retained earnings of slightly under $51,000.00. . . .

And there is, indeed, no evidence that I can find on the record that had Mr. Fiorentino had the benefit of all of those provisions which Mr. Wasserman, plaintiff's expert, says should have been included in the documents, that he would have been any better off in terms of getting paid than he was under the present circumstances.

It may be that some would want to argue that that is an issue of collectibility. I don't believe it is. I believe it is part of the plaintiff's burden to establish the case within the case; that is to say, the loss.

N.T. 9/21/93 at 773–75. The judge pro tem ultimately granted the compulsory nonsuit on the following basis:

I grant the defendant's motion for a compulsory non-suit on the ground that there has been a failure of proof as to harm, so as to mean that the plaintiff has not carried his burden at this juncture by any evidence to establish all of the elements necessary to his case.

*Id.* at 777.

■ Evidence which demonstrates that a plaintiff has suffered the loss of property rights under a contract will suffice to establish "actual injury" or "harm" in a legal malpractice action. *Curran v. Stradley, Ronon, Stevens & Young,* 361 Pa.Super. 17, 25–26, 521 A.2d 451, 455 (1987). Neither the parties nor the trial court judges involved with this case have ever taken the position that Mr. Fiorentino did not suffer the loss of property rights he was entitled to receive pursuant to the terms of his written contract with Mr. Converse. On the contrary, everyone agrees that the sum of $914,833.29 remains to be paid under the Stock Purchase Agreement. The question that has not been addressed by either trial court judge is whether the cross-appellants were legally responsible for this economic "harm" because the Stock Purchase Agreement they prepared failed to protect their client's legitimate interests and that this failure was the proximate cause of Mr. Fiorentino's "actual loss."

■ "Proximate causation" in a legal malpractice action has been defined as "that which, in a natural and continuous sequence, unbroken by any sufficient intervening cause, produced injury, and without which the result would not have occurred." *McPeake,* 381 Pa.Super. at 232, 553 A.2d at 441. Quot-

ing Professor Prosser, the *McPeake* court explained:

> the question of "proximate" causation ... becomes essentially a question of whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred. Quite often this has been stated, and properly so, as an issue of whether the defendant is under any duty to the plaintiff, or whether his duty includes protection against such consequences.

W. Prosser, [*Law of Torts* ] § 42, at 244. Thus, a defendant will not be found to have had a duty to prevent a harm that was not a reasonably foreseeable result of the prior negligent conduct. The rationale behind this rule is that it would be unfair to impose a duty upon persons to prevent a harm that they could not foresee or avoid. *Id.*, 381 Pa.Super. at 232–33, 553 A.2d at 441–42. Unless the evidence is such that reasonable people cannot disagree, the question of whether a defendant's conduct is the cause of the plaintiff's injury or loss is for the jury. *Curran,* 361 Pa.Super. at 25, 521 A.2d at 454 (citing *Vattimo v. Lower Bucks Hospital, Inc.,* 502 Pa. 241, 247, 465 A.2d 1231, 1234 (1983)).

Mr. Converse testified at trial that at the time he entered into the contract of sale with Mr. Fiorentino, J & R's business consisted of leasing, selling, installing, and repairing restaurant equipment. N.T. 9/13/93 at 8, 13.[7] J & R also did a certain amount of "design" work. *Id.* at 13. In 1987, approximately a year after Mr. Fiorentino and Mr. Converse entered into the Stock Purchase Agreement, Mr. Converse set up two new corporations, Ice Systems of New Jersey and Food Service Equipment Contractors. *Id.* at 35. Mr. Converse had no ownership interest in these new entities, but he did serve as president of both corporations. *See* Trial Court Opinion at 9. Mr. Converse's wife and children held majority ownership of the two new corporations. N.T. 9/13/93 at 38.

One of the important assets of J & R was a contract with Hoshasaki to distribute their ice machines. *Id.* at 40. J & R also sold Multiplex brand ice making equipment. *Id.* at 42. Mr. Converse testified that he formed Ice Systems for the specific purpose of handling "the ice part" of J & R's business. *Id.* Eventually, Mr. Converse transferred the Hoshasaki distributorship contract to Ice Systems. *Id.* at 42–43. Food Service took over the sales work formerly handled by J & R. *Id.* at 43. Although Mr. Converse did not explain which corporation took care of the "design" work, he did state that after the establishment of Ice Systems and Food Service, J & R's only business was installation and repairs. *Id.*

Michael F. Bryson testified that he worked for J & R installing and servicing refrigeration and cooking equipment as well as ice machines. N.T. 9/13/93 at 11. He was eventually assigned to perform work for Ice Systems, although he continued to be paid by J & R. *Id.* at 11, 18. Mr. Bryson stated that he was directed by Mr. Converse to use J & R's stock and parts inventory to handle repairs and installations for Ice Systems. *Id.* at 12. In March of 1988, the tools and equipment stored in J & R's warehouse were moved to Ice Systems' location. *Id.* at 12–13. Mr. Bryson further testified that by April, 1988, J & R had no client base because all J & R's customers had become Ice Systems' customers. *Id.* at 13–16. During the time Mr. Bryson worked for J & R and/or Ice Systems, all of J & R's distributorships were transferred to Ice Systems and the service contracts went to Food Service. *Id.* at 17–19. The result was that J & R had no work left to perform by April of 1988. *Id.* at 19.

In 1984, J & R brought in revenue of between 3.1 and 3.2 million dollars. *Id.* at 39. Revenues increased the following year to 3.5 million dollars. *Id.* at 15, 38. However, within a year after the formation of Ice Systems and Food Service Contractors, J & R's assets and revenues had decreased to the point of insolvency and Mr. Converse instituted bankruptcy proceedings for the corporation. *Id.* at 54.

---

7. At some point, leasing operations were transferred to a subsidiary corporation, Leasomatic. *Id.* at 8–13. Ultimately, Mr. Fiorentino assumed full ownership of Leasomatic. *See* Trial Court Opinion at 6.

Mr. Wasserman's expert testimony indicates that common practice among Pennsylvania attorneys, and indeed among attorneys throughout the United States, is to consult form books when drafting an agreement of sale for a business. Such hornbooks contain exemplary contract provisions that protect the seller of a business enterprise in a variety of ways. Common seller protection clauses require corporate stock to be transferred through a third-party escrow arrangement, prohibit the transfer of corporate assets to other entities or persons for other than full and fair market value, and prevent the buyer from setting up businesses that compete with the enterprise providing the payment source for the seller. It is also usual to require the buyer and his or her spouse to co-sign as personal guarantors of payments to the seller in the event the business enterprise loses profitability under the direction of the buyer.

Cross-appellants did not include common seller protection arrangements in the Stock Purchase Agreement between Mr. Fiorentino and Mr. Converse. Thus, nothing prevented Mr. Converse from legally transferring assets from J & R as he saw fit, regardless of whether J & R received fair market value for those assets. Furthermore, nothing in the written contract prohibited Mr. Converse from lawfully conveying J & R's assets directly to his family or to corporate entities controlled by his wife and children. Finally, no protective clause restrained Mr. Converse from setting up enterprises which actively competed with J & R for business. Viewing this evidence in the light most favorable to the plaintiff, we find that the expert's testimony would support the inference that Mr. Converse was able to easily and lawfully force J & R into bankruptcy because cross-appellants failed to draft the agreement of sale for J & R in such a way as to adequately protect Mr. Fiorentino's interests. Thus, a jury could conclude that the quality of the legal services was the proximate cause of J & R's bankruptcy.[8]

■ Once proximate causation has been established, the amount of damages to be awarded is a separate question which is also a matter for the jury. *Curran,* 361 Pa.Super. at 25, 521 A.2d at 454–55. In this case, the proper focus is on the assets and income stream attributable to J & R and to Mr. Converse (as guarantor) at the time Mr. Fiorentino and Mr. Converse executed their Stock Purchase Agreement.[9] Mr. Fiorentino presented relevant financial statements and tax records for both J & R and Mr. Converse

8. For the purposes of this analysis, it is irrelevant that cross-appellants interpret the evidence differently than Mr. Fiorentino does, or that they consider themselves fault-free with regard to the transfer of assets from J & R to Ice Systems of New Jersey and Food Service Contractors, the corporations controlled by Mr. Converse's relatives. It is also irrelevant at this stage of the proceedings that if the trial judge had not granted the compulsory nonsuit, cross-appellants might have been able to demonstrate that J & R's bankruptcy stemmed from causes other than competition from Ice Systems and Food Service or from being stripped of its corporate assets. As we have noted several times, when reviewing the grant of a compulsory nonsuit, we must resolve any conflicts in the evidence in favor of the plaintiff. *Gregorio,* 451 Pa.Super. at 158, 678 A.2d at 813.

9. We are cognizant of cross-appellants' assertion that the relevant time frame for valuing J & R is either the date of the corporation's bankruptcy or the date on which the federal proceedings were initiated against Mr. Converse. This contention is illogical. The essence of Mr. Fiorentino's claim is that it was the responsibility of his attorneys to protect him by preserving J & R's assets as they existed in 1985 through January of 1986—the period during which the terms of the Stock Purchase Agreement were negotiated and executed. Focusing on the financial status of J & R *after* its assets were stripped would completely insulate the defendants from the consequences of their alleged failure to preserve those assets as the source of funds for the stock buy-out.

It is up to a jury to decide whether the defendants are culpable in this regard. *Curran, supra.* However, if a jury finds liability, the proper level of damages hinges on the determination of whether J & R originally possessed resources adequate to fund the buy-out in the absence of malpractice on the part of the cross-appellants. We cannot agree that Mr. Fiorentino's damages were "speculative" on the grounds that J & R went into bankruptcy and money cannot be collected from an insolvent debtor. The heart of Mr. Fiorentino's claim is that the bankruptcy would have been averted if the Stock Purchase Agreement had been properly drafted to prevent the transfer of assets away from J & R into receptacle corporations that actively competed with J & R for business. Premising damages on the financial status of J & R after it became insolvent would reward cross-appellants for the very failure to protect their client which is the basis for Mr. Fiorentino's complaint.

for the purpose of demonstrating that assets and income existed in 1985 which could have been secured in order to ensure that Mr. Fiorentino would be paid. N.T. 9/21/93 at 695–727. Among other things, the financial statements indicated that J & R reported assets of seven hundred fifty-seven thousand five hundred fifty-one dollars ($757,551.00) and income in excess of three million dollars ($3,000,000) in 1985. *Id.* at 710. This was an adequate basis to establish Mr. Fiorentino's damages, if the jury had been permitted to address that question.

As previously stated, the grant of a compulsory nonsuit is proper only if the evidence is clear and there is no room for fair and reasonable disagreement that the plaintiff has failed to establish the elements of his or her cause of action. *See Gregorio* and *Long, supra.* Our careful scrutiny of the certified record has convinced us that Mr. Fiorentino presented evidence which, if believed by a jury, would have established the necessary elements to sustain his causes of action. Furthermore, he also adduced evidence concerning the amount still to be paid pursuant to the Stock Purchase Agreement, and provided adequate financial information regarding the assets that could have been secured to guarantee payment.[10] We are therefore constrained to conclude that compulsory nonsuit was improperly entered in this case.

 Cross-appellants argue that the trial judge and the post-trial motions judge improperly refused to find that Mr. Fiorentino's suit is time-barred under both the two-year statute of limitations applicable to tort claims [11] and the four-year period that governs contract disputes.[12] Judge Pro Tem Rutter held that the question of when the causes of action accrued is a matter for the jury, and Judge Massiah–Jackson agreed. *See* Trial Court Opinion dated 12/5/95 at 14–15. In Pennsylvania, the occurrence rule is used to determine when the statute of limitations begins to run. *Robbins & Seventko v.*

*Geisenberger,* 449 Pa.Super. 367, 372, 674 A.2d 244, 246 (1996). Under the Pennsylvania occurrence rule, the statutory period commences when the harm is suffered, or if appropriate, at the time an alleged malpractice is discovered. *Bailey v. Tucker,* 533 Pa. at 252, 621 A.2d at 115.

> Whether the statute has run on a claim is usually a question of law for the trial judge, but where the issue involves a factual determination, the determination is for the jury. Specifically, the point at which the complaining party should reasonably be aware that he has suffered an injury is generally an issue of fact to be determined by the jury; only where the facts are so clear that reasonable minds cannot differ may the commencement of the limitations period be determined as a matter of law.

*Hayward v. Medical Center,* 530 Pa. 320, 325, 608 A.2d 1040, 1043 (1992) (citations omitted).

Judge Massiah–Jackson stated that "reasonable minds" could differ concerning the point in time at which Mr. Fiorentino's injury actually happened:

> In the instant matter, a jury could reasonably find that Mr. Fiorentino incurred injury when any one of the following events occurred: (1) the initial drafting and signing of the Stock Purchase Agreement in January 1986; (2) the first time Mr. Converse requested a decrease in the monthly installments due to Mr. Fiorentino in February, 1987; or (3) the complete default in payment by Mr. Converse in February, 1988.

Trial Court Opinion at 15.

 In an assumpsit case, "a cause of action accrues when there is an existing right to sue forthwith on the breach of contract." *Leedom v. Spano,* 436 Pa.Super. 18, 28, 647 A.2d 221, 226 (1994). Thus, we agree with Judge Massiah–Jackson that a jury could conclude that cross-appellants breached their

---

**10.** We note that the trial judge refused to admit certain evidence concerning Mr. Converse's personal assets. Because Mr. Converse signed a written agreement agreeing to act as guarantor for the Stock Purchase Agreement, his personal assets at the time the Agreement was executed are relevant to this action.

**11.** 42 Pa.C.S.A. § 5524.

**12.** *Id.* § 5525.

contract with Mr. Fiorentino when they failed to follow his instruction to draft the Stock Purchase Agreement in a manner that would protect his right to be paid. *See* N.T. 9/14/93 at 321. However, the mere breach of a professional duty that causes only the *threat* of *unrealized* future harm does not suffice to create a cause of action for negligence. *Rizzo*, 520 Pa. at 504–05, 555 A.2d at 68. Therefore, the negligent drafting of the Stock Purchase Agreement could not vest a torts claim against the lawyers who prepared it unless or until one of the parties to that Agreement acted under color of the agreement to harm the interests of the other party. As long as Mr. Converse continued to make the payments specified in the Stock Purchase Agreement, Mr. Fiorentino suffered no economic harm. Thus, the torts claims could not have accrued against cross-appellants before February of 1987, when the parties agreed to reduced payments, but may have occurred as late as February of 1988 when Mr. Converse ceased to make any payments.

Mr. Fiorentino filed his complaint against cross-appellants on March 28, 1989. If a jury found that the underlying breach occurred in February of 1987, the trespass claims would be time-barred even though the assumpsit action would remain viable. However, if the jury found that Mr. Fiorentino's causes of action did not accrue until February of 1988, the complaint was timely filed for both purposes. Because the question of when the injury occurred is a matter for the jury, we find that both Judge Pro Tem Rutter and Judge Massiah–Jackson correctly refused to grant relief on statute of limitation grounds.

Cross-appellants also contend that Mr. Fiorentino's breach of contract claim is really an "implied contract" claim that sounds in tort not assumpsit. The thrust of this argument is that Mr. Fiorentino cannot recover in assumpsit unless he demonstrates both the existence of a contract with cross-appellants and the breach of a specific provision of that contract. *See Rogers, supra.* The point is that if Mr. Fiorentino cannot satisfy this requirement, then his entire case is governed by a two-year, not a four-year, statute of limitations. However, we see no difficulty instantly because Mr. Fiorentino testified that he explicitly informed cross-appellants that the service he wished them to perform for him was to generate the legal papers necessary to convey his ownership interest in J & R to Mr. Converse while protecting his rights to receive payments for the stock transfer. N.T. 9/14/93 at 321. Viewing this testimony in the light most favorable to the plaintiff, as we must at this stage of the proceedings, we find that it sufficiently establishes the existence of an express contract, not an implied contract.

We reverse the final judgment and vacate the order granting compulsory nonsuit. The case is remanded for a new trial.