J-A04006-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| KEYSTONE CUSTOM HOMES, INC. AND WILLOW CREEK, LLC | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : : : | |
| v. | : : : | |
| | : : | No. 637 EDA 2021 |
| BRADLEY A. ZUKE, ESQUIRE AND APPEL & YOST, LLP | : : : : : | |
| WILMER AND JOYCE HOSTETTER, H/W | : : : | |
| v. | : : : : | |
| BRADLEY A. ZUKE, ESQUIRE AND APPEL & YOST, LLP | : | |

Appeal from the Order Entered March 5, 2021
In the Court of Common Pleas of Chester County Civil Division at No(s):
No. 2015-07661-PL

BEFORE:  LAZARUS, J., NICHOLS, J., and McLAUGHLIN, J.

MEMORANDUM BY LAZARUS, J.: **FILED JULY 15, 2022**

Keystone Custom Homes, Inc., and Willow Creek, LLC, (collectively, Plaintiffs) appeal from the order denying their post-verdict motions, following the entry of judgment in favor of Appellees/Defendants, Appel & Yost, LLP, and Bradley Zuke, in consolidated legal malpractice actions that arises from Zuke's preparation of a public offering statement (POS) for a planned community.  After careful review, we affirm.

Keystone is a Pennsylvania corporation, headquartered in Lancaster, Pennsylvania, that purchases and develops real estate and constructs homes in southern Chester County. In 2002, Wilmer and Joyce Hostetter (the Hostetters) purchased a 65-acre parcel of land located in East Nottingham Township, Oxford, Chester County, with the intention of developing the property into lots for a residential subdivision. On April 15, 2003, the Hostetters entered into a contract to sell Keystone the individual lots after the Hostetters developed the land and obtained subdivision approval. Keystone's affiliate, Willow Creek, LLC,[1] intended to buy and sell the lots to third parties, while Keystone planned to construct the residences, and market and sell the homes. The subdivision, Hopewell Ridge (Community), is a planned community[2] that consists of 29 one-acre lots.

The Hostetters developed the infrastructure for the subdivision and finished the lots; they planned to have all 29 lots serviced by on-lot sewage disposal and private on-lot water wells. In 2002, the Hostetters applied for a sewage permit with Chester County Health Department, had the necessary soil testing completed, and applied for on-lot sewage disposal. However, in

---

[1] The trial court found as a fact that Keystone and Willow Creek are separate and distinct legal entities that maintain separate financial books and records and separate financial transactions. **See** Trial Court Opinion, Finding of Fact #6, 12/18/20, at 2.

[2] The Community was developed as a planned community under the Pennsylvania Uniform Planned Community Act (PUPCA), 68 Pa.C.S.A. § 5101, *et seq*.

2004, following a hydrogeological evaluation of the Community, the Hostetters learned that 20 of the 29 lots contained groundwater with a nitrate-nitrogen concentration that exceeded the acceptable limits of the Pennsylvania Department of Environmental Protection (DEP).[3] To remedy the wastewater issue for those 20 lots, the Hostetters chose to use experimental septic systems known as EnviroServers[4]—on-site, small-flow septic systems that treat sewage in an effort to reduce nitrates in the groundwater. While the DEP approved a revision to the Township Official Sewage Facilities Plan for the Community, the DEP noted that it "consider[ed] the EnviroServer[s] to be experimental technology for this use. Therefore, a conventional backup

_____

[3] Due to the lot sizes, the normal on-lot sewage disposal systems were not feasible because the nitrates passing the property boundaries would exceed the limit of 10 parts per million (PPM). Because the Hostetters had already received township planning commission recommendations for final plan approval, with minimum lot sizes of one-acre each, the Hostetters were not able to increase the lot sizes to remedy the nitrate-soil issue.

[4] EnviroServers use a seven-stage process to treat the effluent. Initially, wastewater is gravity fed into a compartment where the sludge and solids are settled. Then, in the second stage, the wastewater is aerated using a low-pressure air compressor and diffuser; aeration promotes the growth of microorganisms, which convert and remove biodegradable organic matter. In the third stage, nitrification occurs and microorganisms are converted from ammonia to nitrates using oxygen. In the fourth stage, the treated wastewater is clarified and solids are settled. Next, in stage five, the carbon in the recirculated wastewater promotes nitrogen to be released as a gas. In stage six, solids are removed from the water. Finally, in stage seven, the clarified water leaves the treatment compartments through a filter and the effluent is ready for discharge. ***See*** https://www.nexgenseptics.com/product/enviroserver/ (last visited on 6/2/22).

sewage disposal method is required. The D[EP] acknowledges that the subdivision will be connected to public sewage facilities tributary to the Oxford Area Sewer Authority, in the event the experiment is deemed a failure." DEP Letter, 11/23/05.[5]

The Hostetters retained counsel to prepare the bylaws of the Community's Homeowners Association (HOA). In February 2006, the Hostetters issued a declaration for the Community, which lists the Hostetters as the owner of the Community. The declaration disclosed information to potential purchasers regarding the operation, maintenance, and repair of the EnviroServers, as well as the proposed costs related to the system. Specifically, the HOA declaration stated that the HOA would be responsible for the maintenance, repair, and replacement of small-flow sewage treatment and disposal systems and on-lot systems in the development. Third-party companies performed the installation, maintenance, repairs, and monitoring of the EnviroServers. During the construction of the homes, Keystone discovered issues with the EnviroServers.

---

[5] A sewer permit, also issued by the DEP, contained the following conditions regarding the Community: conventional back-up contingency should EnviroServers be unable to meet discharge limits and municipality to be provided with bond, escrow account, or bank letter of credit, which would be forfeited upon notice by DEP of noncompliance with permit.

In 2007, Keystone retained Defendants[6] to prepare a POS for the Community, a requirement under the PUPCA.[7] Defendants verbally agreed to prepare the POS; Keystone intended to provide the POS to prospective purchasers of the subdivision homes. From February 2007 through 2010, Keystone distributed the POS, providing copies to all purchasers and prospective home purchasers. The POS listed the Hostetters and Keystone as the sellers of the real estate; it did not disclose the existence or role of Willow Creek with regard to the Community.

In April 2008, the DEP conducted an inspection of the Community's sewage systems, noting the following areas of concern: erosion problems resulting in oil deposits impacting treatment units and field drains; unauthorized access to treatment units; and improper removal of alkalinity from water, which is essential for treatment process. In July 2008, the DEP notified Hostetter that samples of the influent and effluent associated with the EnviroServers were not consistently meeting the Mg/L effluent limit of total nitrogen as required by the permit.

Homeowners became dissatisfied with the third-party companies involved with the operation of the EnviroServers and, during the course of an

---

[6] At the time, Defendant Bradley A. Zuke, Esquire, was an employee of and practicing law for Defendant Appel & Yost. Attorney Zuke prepared the POS for Keystone.

[7] Under the PUPCA, an owner or developer of land being developed and sold for residential use as a "planned community" is required to provide a public offering statement describing information and features of the property and proposed development. 68 Pa.C.S.A. §§ 5402-5405.

investigation, learned that the EnviroServers were being used at the Community due to the elevated level of nitrates in the Community's groundwater. In 2011, the Community homeowners reviewed the portion of the POS discussing the EnviroServers. First, the POS incorrectly listed Keystone as the seller of the homes. Second, the POS identified the Hostetters as the "sole Declarants" who were the "developers" of the Community.[8] Third, the POS stated that the Community is to be serviced by public water; it did not disclose that there were elevated levels of nitrates in the Community's groundwater. Despite the language in the POS, Keystone did not provide public water to the Community. Instead, Keystone provided potable water to each home using private well water, and utilized "Reverse Osmosis" water treatment systems to those homes where the level of nitrates in the wells exceeded applicable environmental limits. Keystone obtained permits from the Chester County Health Department certifying the wells to provide public water to the Community homes, save those that needed a treatment system.

In February 2012, the DEP notified the HOA that the existing septic systems for 20 of the properties were noncompliant and required the HOA to provide a description of the steps necessary to implement the backup sewer contingency plan proposed by the Plaintiffs in conjunction with their permit request. The DEP notified the Hostetters and East Nottingham Township that,

---

[8] The Purchase Agreement section of the POS states that the "the Declarant [the Hostetters] *and* Keystone [] will construct and sell the homes within the Community."

in light of the EnviroServers' continued noncompliance with the nitrogen limit in the Community's sewage permit, public sewers must be extended to serve the Community, at an estimated cost in excess of $10,000,000.00.

In August 2013, the Community homeowners filed a lawsuit (Homeowners litigation/**Barker**) in federal court against Keystone, Willow Creek, and the Hostetters (Homeowner Litigation-defendants) seeking damages in the form of loss of value and marketability of their homes and expenses related to nitrates in their water. The homeowners alleged that they incurred damages as a result of Homeowner Litigation-defendants withholding material information from them, misrepresenting facts about the Community's sewage systems and water supply (i.e., failure to disclose the elevated level of nitrates in the Community's groundwater), failing to properly monitor the EnviroServers, and failing to provide public water to the Community as per the POS. **See Barker, et al. v. Hostetter, et al.**, No. 13-5081 (E.D. Pa. 2013). Specifically, in the complaint, Homeowners allege that "Hostetter and Keystone had long been aware that serious issues existed with the feasibility of using on[-]lot sewage systems and private on-lot wells" and that because "20 of the 29 lots in Hopewell Ridge were unsuitable for standard septic systems due to 'groundwater nitrogen plum[e] migration off-site[,] a workable solution proposes the use of individual on-lot nitrogen control treatment systems on those 20 lots.'" Homeowner's Complaint, 8/29/13, at ¶¶ 35, 37. On March 27, 2017, the parties entered into a settlement agreement in **Barker**, whereby Homeowner-defendants agreed to: pay each homeowner

$25,000; pay $25,000 to fund the Community's HOA; inspect, service and maintain the EnviroServers septic systems for two years; take all steps to obtain an amended Wastewater Management Permit from the DEP; and, at Keystone's expense, install public water service to every home in the Community. *See id.* at *4. Homeowner-defendants also agreed to pay "reasonable attorneys['] fees and litigation expenses incurred by [Plaintiffs], the reasonable amount of which shall be mediated[.]" *Id.* When the parties were unable to agree on the amount of attorneys' fees to be awarded, the fee dispute was referred by a magistrate for binding arbitration to the U.S. District Court. The district court ultimately granted Plaintiffs' attorneys' fees in the amount of $1,647,695.41, as well as an additional $100,000 in costs. *See id.* at *2.[9]

After the commencement of the Homeowner litigation, Keystone reviewed the POS and realized that Defendants had made several errors in the POS, including statements that: (1) public water will be available to all lots in the Community; (2) public water lines will be dedicated; (3) the Community will be subject to utility easements for water; and (4) the Hostetters warranted that the water line will be free from defects for one year. Keystone also realized that Defendants had failed to disclose in the POS that

_____

[9] The United States Court of Appeals for the Third Circuit affirmed the District Court's decision to refuse to retain jurisdiction over the parties' settlement agreement after the case was dismissed. *See Barker v. Hostetter*, No. 17-3760 (3d Cir. Pa. 2019) (noting if parties do not satisfy clear terms of settlement agreement, plaintiffs may initiate new action to seek enforcement).

there were elevated levels of nitrates in the Community groundwater that was being treated.

Plaintiffs instituted the instant action against Defendants by filing a praecipe for a writ of summons on August 26, 2015. Plaintiffs alleged that, as a result of Defendants' malpractice, they were sued in federal court by the Community homeowners and incurred significant damages in the form of attorneys' fees and settlement funds. The Hostetters also filed a similar lawsuit against Defendants. On April 26, 2016, the trial court, upon motion, consolidated the two cases.[10] On March 20, 2017, Plaintiffs filed a complaint against Defendants. On April 7, 2017, Defendants filed preliminary objections to the complaint. On April 26, 2017, Plaintiffs filed an amended complaint against Defendants, raising the following claims: legal malpractice (Count I), equitable disgorgement of fees (Count II), breach of contract (Count III), negligence (Count IV), and indemnification (Count V). The court overruled, as moot, Defendants' preliminary objections. Defendants filed an answer and new matter to the amended complaint. Plaintiffs filed a reply to new matter.

On March 15, 2018, Defendants filed a motion for summary judgment; Plaintiffs filed a response to the motion on April 16, 2018. On June 19, 2018, the trial court denied the motion for summary judgment. Defendants then filed a motion for reconsideration, requesting the court reverse its order

---

[10] Cases Nos. 2015-0766 & 20105-07708 were consolidated under case No. 2015-07661. The Hostetters are not parties to the present appeal.

denying summary judgment because Plaintiffs' claims are time-barred. The court denied the reconsideration motion on July 23, 2018.

A 35-day bench trial commenced on January 28, 2019, and concluded on March 6, 2020. At the end of Plaintiffs' case, Defendants moved for nonsuit, which the trial court granted as to Plaintiffs' negligence and breach of contract claims. The court concluded that Plaintiffs did not offer sufficient evidence to establish that Appel & Yost failed to fulfill any instructions or contractual terms. The court also determined that the gist of Plaintiffs' action sounded in tort, not contract.[11] During oral argument on the motion for nonsuit, Plaintiffs orally withdrew their claim for equitable disgorgement. Thus, trial proceeded solely on Plaintiffs' claims for legal malpractice and common law indemnification.

On December 18, 2020, the trial court entered an order granting judgment in favor of Defendants and against Plaintiffs. The trial court determined that, under the "occurrence rule," the statute of limitations on Plaintiffs' legal malpractice claim began to run in 2007, when Defendants breached their duty of care in failing to exercise reasonable care in the preparation of the POS. Thus, because Plaintiffs did not initiate their claim

---

[11] ***See Bruno v. Erie Ins. Co.***, 106 A.3d 48, 68-70 (Pa. 2014) ("[A] negligence claim based on the actions of a contracting party in performing contractual obligations is not viewed as an action on the underlying contract itself, [but] . . . the contract is regarded merely as the vehicle, or mechanism, which established the relationship between the parties, during which the tort of negligence was committed.").

until August 26, 2015, more than two years after Defendants' alleged breach, the action was time-barred.[12]

Plaintiffs filed timely post-trial motions. Following oral argument, the court denied the motions on March 5, 2021. Plaintiffs filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Plaintiffs raise the following issues for our consideration:

(1) Whether the [trial c]ourt erred as a matter of law and/or abused its discretion when it held that a client is precluded as a matter of law from obtaining damages for legal malpractice [when] the client was not aware for years of an attorney's breach of duty of care in the preparation of a legal document because there is no requirement under Pennsylvania law that the client review the attorney's work for accuracy and the client did not do so because the client relied upon the attorney's work.

(2) Whether the [trial c]ourt erred as a matter of law and/or abused its discretion when it failed to conclude that the attorney's negligence was the proximate cause of the client's substantial liability in litigation arising directly from

_____

[12] Moreover, the court noted that even if Plaintiffs' claims were not time-barred, Plaintiffs had failed to demonstrate that Defendants had a duty where the attorney-client relationship was solely between the Defendants and Keystone, not Willow Creek. Additionally, the court determined that Willow Creek was not an intended third-party beneficiary of Keystone's attorney-client relationship. Finally, the court found that while Defendants failed to exercise reasonable care with regard to preparing portions of the POS, Keystone failed to demonstrate proximate cause—i.e., that the errors from Defendants' lack of care were the proximate cause of Keystone's damages. Specifically, the trial court was not convinced that even if the POS been properly prepared by Defendants, that the homeowners would still not have instituted the federal lawsuit.

the attorney's error, which error forced the client to settle that litigation in order to mitigate the client's damages.

(3)     Whether the [trial c]ourt erred as a matter of law and/or abused its discretion when it failed to conclude that two companies which retained and paid for the services of an attorney were clients of the attorney to whom the attorney had a duty to prepare a legally compliant P[OS.]

(4)     Whether the [trial c]ourt erred as a matter of law and/or abused its discretion when it failed to conclude that the attorney's negligence was the proximate cause of the client's substantial liability in litigation arising directly from the attorney's error, which error forced the client to settle that litigation in order to mitigate the client's damages.

(5)     Whether the [trial c]ourt erred as a matter of law and/or abused its discretion when it failed to find in favor of the client on the client's indemnification claim and conclude that the client's liability in litigation resulting from the attorney's error was the result of the attorney's undisputed negligence.

(6)     Whether the [trial c]ourt erred as a matter of law and/or abused its discretion when it failed to conclude that a client can maintain a breach of contract claim against an attorney despite undisputed record evidence of the attorney's failure to prepare a legally compliant public offering statement as required by the parties' contract which resulted in damages to the client as demonstrated at trial.

Appellants' Brief, at 6-8.

In Pennsylvania, courts apply the occurrence and discovery rules when assessing the statute of limitations in a legal malpractice action.  ***Glenbrook Leasing Co. v. Beausang***, 839 A.2d 437, 442 (Pa. Super. 2003).

The trigger for the accrual of a legal malpractice action, for statute of limitations purposes, is not the realization of actual loss, but the occurrence of a breach of duty.  Pennsylvania law provides that:

the occurrence rule is used to determine when the statute of limitations begins to run in a legal malpractice action. Under the occurrence rule, the statutory period commences

- 12 -

upon the happening of the alleged breach of duty. An exception to this rule is the equitable discovery rule which will be applied when the injured party is unable, despite the exercise of due diligence, to know of the injury or its cause. ***Pocono [Int'l] Raceway v. Pocono Produce, Inc.***, [] 468 A.2d 468, 471 ([Pa.] 1983). Lack of knowledge, mistake[,] or misunderstanding[] will not toll the running of the statute. ***Id.*** [] 468 A.2d at 471.

Pennsylvania favors strict application of the statutes of limitation. Accordingly, the statute of limitations in a legal malpractice claim begins to run when the attorney breaches his or her duty, and is tolled only when the client, despite the exercise of due diligence, cannot discover the injury or its cause.

***Communications Network Int'l. v. Mullineaux***, 187 A.3d 951, 960-61 (Pa. Super. 2018) (citation omitted) (emphasis omitted). ***See also Dalrymple v. Brown***, 701 A.2d 164, 223 (Pa. 1997) (discovery rule "provides that where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed statutory period, the limitations period does not begin to run until the discovery of the injury is reasonably possible").

Instantly, the trial court found that, under the occurrence rule, Plaintiffs' legal malpractice claim began to run in February 2007, "when Attorney Zuke, on behalf of Appel & Yost, prepared and forwarded to Keystone [] its error[-]filled POS." Trial Court Opinion, 12/18/20, at 56. Plaintiffs argue on appeal, however, that under the discovery rule their cause of action against Defendants did not accrue until August 29, 2013, when the homeowners instituted the federal action, because it was at this moment that "Keystone's damages became 'identifiable' and more than just potential future harm." Appellants' Brief, at 48.

An action for legal malpractice may be brought in either contract or tort. The elements of a legal malpractice action, sounding in negligence, include: (1) employment of the attorney or other basis for a duty; (2) failure of the attorney to exercise ordinary skill and knowledge; and (3) that such failure was the proximate cause of the harm to the plaintiff.

\* \* \*

[I]t is undisputed that the two-year limitations period applies to the negligence claim and the four-year limitations period applies to the breach of contract claim.

**Wachovia Bank, N.A. v. Ferretti**, 935 A.2d 565, 570-71 (Pa. Super. 2007).

"An attorney will be deemed 'negligent' if he or she fails to possess and exercise that degree of knowledge, skill and care [that] would normally be exercised by members of the profession under the same or similar circumstances." **Fiorentino v. Rapoport**, 693 A.2d 208, 213 (Pa. Super. 1997). **See Wachovia**, **supra** at 571 ("With regard to a breach of contract claim, an attorney who agrees for a fee to represent a client is by implication agreeing to provide that client with professional services consistent with those expected of the profession at large.").

In **Wachovia**, the appellant similarly argued that a plaintiff must suffer "actual loss" before the statute of limitations is triggered in a legal malpractice action. On appeal, our Court reiterated that "the trigger for the accrual of a legal malpractice action, for statute of limitations purposes, is not the realization of actual loss, but the occurrence of a breach of duty." **Id.** at 573. Moreover, the statute of limitations "is tolled only until the injured party should reasonably have learned of the breach." **Id.** at 574. Thus, the question in

the instant case is: when should Plaintiffs have reasonably learned of Defendants' breach?

Here, the trial court concluded that, even as non-lawyers, Plaintiffs could have learned of Defendants' breach by exercising reasonable diligence in reviewing the POS when Defendants provided it to Plaintiffs in February 2007. Trial Court Opinion, 12/18/20, at 57. Specifically, the court found that, at a minimum, Plaintiffs would have reasonably discovered the erroneous statements in the POS that the Community would be serviced by public water and not, as Keystone and the Hostetters planned, on-site wells and septic systems.

Moreover, the trial court noted that Plaintiffs were clearly on notice of the Community homeowners' frustration and dissatisfaction with the use of the EnviroServers systems at a HOA Executive Board meeting in October 2011. *See* Appellants' Brief, at 47 (Plaintiffs acknowledging that their representative, Ms. Frame, attended meeting where there "was a discussion about a reference to public water in the POS"). Finally, Plaintiffs should have been on notice of Defendants' breach in February 2012, when the DEP notified the Hostetters and East Nottingham Township that the EnviroServers were consistently noncompliant and that they needed to switch to public sewers. *See Fine v. Checcio*, 870 A.2d 850, 858-59 (Pa. 2005) (with regard to plaintiff exercising reasonable diligence in investigating cause of action in legal malpractice action, "the question in any given case is . . . what might he have

- 15 -

known, by the use of the means of information within his reach, with the vigilance the law requires of him?").

Because Plaintiffs could have reasonably known about Defendants' breach of duty more than two years from the date that they filed the instant lawsuit, regardless of whether damages were speculative at that point, we agree with the trial court that the statute of limitations expired on Plaintiffs' legal malpractice claim and, thus, judgment was properly entered in favor of Defendants.  **Communications Network Int'l.**, **supra**; **Wachovia**, **supra**.

Order affirmed.[13]

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/15/2022

---

[13] Having concluded that Plaintiffs' action is time-barred by the statute of limitations, we need not address Plaintiffs' remaining issues concerning whether Defendants were negligent.

- 16 -