**Spang & Co. v. Reed, Smith, Shaw & McClay**

C.P. of Allegheny County, no. GD96-8964.

*Anthony P. Picadio*, for plaintiff.
*William Pietragallo II*, for defendant.

WETTICK, *J.*, May 8, 1997—The motion for judgment on the pleadings of defendant "Reed Smith" is the subject of this opinion and order of court. This

motion is based on the affirmative defense of the statute of limitations.

This is a legal malpractice action. The facts set forth in this opinion are based on those factual averments in the pleadings that are favorable to plaintiff "Spang." Reed Smith has denied many of the factual allegations that I am describing.

Spang negotiated pension agreements with the United Steel Workers of America for employees whom the union represented. The final pension plan was a 1978 agreement that expired on September 30, 1981. This plan included a provision that any contributions made by the company to the pension plan would not revert to the company.

In early summer of 1981, Spang announced that it intended to close the plant where the employees covered by this pension plan worked. Thereafter, Spang and the union engaged in collective bargaining concerning the closing of the plant. During the negotiations, the union sought Spang's agreement to provide severance payments, extended health insurance, and other benefits to which the employees would not otherwise be entitled. The negotiations also covered any surplus funds remaining in the pension plan. The union sought an agreement that these funds would be paid to the plan participants while Spang requested that the union relinquish any claim to these surplus funds.

After talks reached an impasse, the union and others sued Spang in the United States District Court for the Western District of Pennsylvania at no. 81-1750 seeking, inter alia, a declaration that any surplus pension funds belonged to the plan participants. Thereafter, the union and Spang resumed collective bargaining and the negotiators for the parties reached an oral agreement under which Spang would provide severance pay and other

benefits in exchange for the union's releasing the claim to the surplus pension funds and discontinuing the federal litigation.

Spang had retained attorneys employed by Reed Smith to review language of a proposed shutdown agreement that Spang's inhouse counsel had prepared. Reed Smith was asked to ensure that the terms of the shutdown agreement would allow Spang to receive any surplus pension assets. Reed Smith suggested certain changes in the language of the proposed shutdown agreement that Spang had prepared. Reed Smith advised Spang that this proposed agreement with Reed Smith's changes, coupled with an amended pension plan that Spang would unilaterally adopt after the union and Spang executed the proposed shutdown agreement, would allow Spang to receive any surplus funds remaining in the plan. On October 17, 1981, the shutdown agreement containing Reed Smith's suggestions was executed by the parties.[1]

On October 21, 1981, there was a hearing in the United State District Court to discontinue the litigation filed at no. 81-1750. No Spang representative attended this hearing other than its Reed Smith counsel. During the hearing, counsel for the union stated on the record that the agreement which had been reached between the union and Spang did not resolve the surplus pension assets issue in favor of either party, but rather, left resolution of the issue to future litigation in the event the plan was terminated at a time when surplus assets

---

1. In its answer to plaintiff's complaint, Reed Smith denies that it was retained to review the proposed shutdown agreement to ensure that the language would allow Spang to receive any surplus pension funds. Reed Smith alleges that Spang never advised Reed Smith that Spang and the union had reached an agreement under which Spang would receive the surplus funds.

existed. Reed Smith counsel representing Spang at the hearing knew that a purpose of the shutdown agreement was to give Spang any surplus pension funds. However, counsel failed to state on the record that the union's statement was incorrect but rather made a statement on the record which appeared to agree with the statement made by the union's counsel.

Reed Smith never advised Spang of the statements made at this hearing. Also, Reed Smith failed to take the required steps to make the amended pension plan the controlling plan document.

In 1988, Spang terminated the plan and arranged for the surplus funds within the plan to be paid to Spang. Thereafter, three virtually identical lawsuits were filed against Spang in the United States District Court for the Western District of Pennsylvania in which the plaintiffs claimed that the surplus pension assets received by Spang should be returned to the plan and distributed to the plan participants.

In this federal litigation, the plaintiffs alleged that the union had never agreed to release the claim to the surplus pension funds, that the dispute over the surplus funds was governed by the language of the 1978 pension plan and the October 17, 1981 shutdown agreement, and that on their face these agreements clearly provided for the plan participants to receive the surplus funds. Spang, on the other hand, contended that the language of the shutdown agreement coupled with the language of the amended pension plan established its right to the surplus funds. In addition, Spang introduced evidence concerning the negotiations of the shutdown agreement which allegedly supported its position that the union had released its claim to the surplus funds in exchange for severance pay and other benefits.

On June 30, 1994, Magistrate Judge Kenneth Benson filed a report and recommendation which recommended the entry of summary judgment in the plaintiffs' favor.

Magistrate Judge Benson concluded that the 1978 pension plan governed the surplus funds unless there was language in the October 17, 1981 shutdown agreement that supported Spang's position that subsequently the union had given up its right to surplus funds. He said that "[i]n reviewing the agreement itself, it is apparent that the parties did not reach an agreement with respect to the surplus funds. The funds are not mentioned in any part of the agreement." June 30, 1994 report and recommendation at 8. He also said that the shutdown agreement specifically provided that all participants would receive the pension benefits to which they were entitled as described in the pension agreements and that these agreements provided that Spang's contributions would not revert to Spang. Thus, he found that the shutdown agreement was not a bar to the participants' claims. *Id.* at 9. Also, Magistrate Judge Benson refused to consider evidence concerning the negotiations leading up to the shutdown agreement that allegedly supported Spang's position that the union had bargained away the right to rely on the nonreversion clause in the 1978 pension plan. He ruled that it is "irrelevant in the face of unambiguous language in the contract which provides that it is to be interpreted without resort to negotiation history." *Id.* at 8.

Magistrate Judge Benson also found merit to the union's argument that Spang was estopped from relying on the shutdown agreement as a waiver of the plaintiffs' rights under the 1978 pension plan because of the representations made at the October 21 1981 federal court proceedings: "Spang's attorney made representations to the court in furtherance of Spang's interest in gar-

nering court approval of the settlement of a lawsuit, and in direct response to the court's concern that the plan's participants not be prejudiced by settlement." *Id.* at 10 n.5.

On September 6, 1994, District Judge Donald Lee adopted Magistrate Judge Benson's report and recommendation and several months later entered a final order setting damages in the amount of $6,919,001 plus interest from August 30, 1988. The Court of Appeals for the Third Circuit affirmed without an opinion on February 7, 1996.

In the present lawsuit, Spang has raised breach of contract and negligence claims against Reed Smith in which it alleges that it has suffered damages in the amount of $6,919,001 plus interest at the federal rate from August 30, 1988. In its motion for judgment on the pleadings, Reed Smith contends that the lawsuit was not timely filed.

In 1981, Reed Smith allegedly breached any professional duty that it owed Spang under tort and contract law. In 1989, Spang became aware of the conduct that allegedly constituted a breach of the professional duty that Reed Smith owed Spang. This lawsuit was commenced by a complaint filed on June 13, 1996.

This lawsuit was not filed within four years of either the alleged breach or Spang's knowledge of the alleged breach. Consequently, it is Reed Smith's position that even if Spang's claims are governed by the four-year limitation period which applies to causes of action for breach of contract, Spang's claims are barred by the statute of limitations.[2]

---

2. In this case, it does not matter whether Spang's causes of action are governed by the two-year limitation period that governs tort actions or the four-year limitation period that governs contract actions. The dispute is over when the causes of action accrued. If

Reed Smith's position would be correct if Spang's causes of action accrued within four years of the alleged breach or, if later, within four years of the discovery of the breach. However, any cause of action for legal malpractice may not be instituted until an attorney's breach of his or her professional duty has caused economic harm.

Prior to 1980, there was case law which supported the position that a cause of action accrued against an attorney even though the client had not yet suffered any loss. However, in *Duke & Co. v. Anderson,* 275 Pa. Super. 65, 418 A.2d 613 (1980), the Superior Court held that Pennsylvania courts will no longer permit malpractice claims to be maintained against an attorney where the client has not sustained any losses. The court stated:

"We therefore conclude that when it is alleged that an attorney has breached his professional obligations to his client, an essential element of the cause of action, whether the action be denominated in assumpsit or trespass, is proof of actual loss." *Id.* at 73-74, 418 A.2d at 617. (citations omitted)

The Pennsylvania Supreme Court has cited with approval the *Duke & Co.* holding that actual loss is an essential element of the cause of action for legal malpractice. See *Rizzo v. Haines,* 520 Pa. 484, 555 A.2d 58 (1989), where the court said:

"Clearly, when it is alleged that an attorney has breached his professional obligations to his client, an essential element of the cause of action, whether the

---

I accept Spang's position, Spang commenced its lawsuit within two years after its causes of action accrued. If I accept Reed Smith's position, Spang did not commence this lawsuit until more than four years after its causes of action accrued.

action be denominated in assumpsit or trespass, is proof of actual loss. *Duke & Co. v. Anderson,* 275 Pa. Super. 65, 73-74, 418 A.2d 613, 617 (1980). The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence. . . . *Schenkel v. Monheit, supra,* 266 Pa. Super. [396] at 399, 405 A.2d [493] at 494 [(1979)] (quoting *Budd v. Nixen,* 6 Cal.3d 195, 200, 491 P.2d 433, 436, 98 Cal. Rptr. 849, 852 (1971)). The test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages. . . . Thus, damages are speculative only if the uncertainty concerns the *fact* of damages rather than the amount. *Pashak v. Barish,* 303 Pa. Super. 559, 561-62, 450 A.2d 67, 69 (1982) (quoting R. Mallen and V. Levitt, *supra,* [*Legal Malpractice*] §302, at 353-54 (2d ed. 1981))." *Id.* at 504-505, 555 A.2d at 68.

Also see, *Ammon v. McCloskey,* 440 Pa. Super. 251, 655 A.2d 549 (1995), where the Superior Court said:

"In a malpractice action based upon a lawyer's representation of a client in a civil matter, a plaintiff must establish the following three elements in order to recover: (1) the employment of the lawyer; (2) the failure of the lawyer to exercise ordinary skill and knowledge; and (3) that such failure was the proximate cause of damage to the plaintiff. *Bailey v. Tucker,* 533 Pa. 237, 246, 621 A.2d 108, 112 (1993); *Composition Roofers Local 30/30B v. Katz,* 398 Pa. Super. 564, 568, 581 A.2d 607, 609 (1990); *Schenkel v. Monheit,* 266 Pa. Super. 396, 399, 405 A.2d 493, 494 (1979). 'In any cause of action for malpractice, some harm must be shown to have occurred to the [client-assignor].' *Com-*

*position Roofers Local 30/30B v. Katz, supra. . . .* See: *Guy v. Liederbach*, 501 Pa. 47, 56, 459 A.2d 744, 749 (1983). Thus, in *Schenkel v. Monheit, supra,* the Superior Court said:

" 'The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence. Hence, until the client suffers appreciable harm as a consequence of his attorney's negligence, the client cannot establish a cause of action for malpractice. *Budd v. Nixen,* 6 Cal.3d 195, 98 Cal.Rptr. 849, 852[-53], 491 P.2d 433, 436-37 (1971).' *Id.,* 266 Pa. Super. at 399, 405 A.2d at 494 (footnote omitted)." *Ammon, supra* at 257-58, 655 A.2d at 552.

In *Pashak v. Barish*, 303 Pa. Super. 559, 450 A.2d 67 (1982), the wife of a longshoreman sued attorneys who had represented her husband in prior litigation in which the husband had settled a claim against a ship owner. In this legal malpractice action, the wife alleged that unbeknownst to her husband, the settlement prevented the wife from recovering any statutory compensation benefits to which she would have otherwise been entitled. The trial court dismissed the claim on the ground that the cause of action had not accrued because the wife's right to statutory compensation benefits would not vest until her husband's death and was conditioned upon the wife surviving her husband. The Superior Court affirmed. The court ruled that the breach of a professional duty causing only speculative harm or the threat of future harm not yet realized is not sufficient to create a cause of action for legal malpractice. The court ruled that the appellant could not pursue this cause of action until her husband's death because "appellant has not yet suffered, and may never

suffer, the harm she alleges." *Id.* at 562 n.2, 450 A.2d at 69 n.2.

In *Bailey v. Tucker,* 533 Pa. 237, 621 A.2d 108 (1993), the Supreme Court addressed the issue of when the statute of limitations commences for a criminal defendant's cause of action against former counsel for the alleged breach of a duty to provide adequate representation. The controlling date is not the date on which the attorney breached his or her professional obligations to the client; rather it is the date of the harm.

"With regard to the respective statutes of limitations, the rule in this Commonwealth is that the statutory period commences at the time the harm is suffered or, if appropriate, at the time the alleged malpractice is discovered. In the context of a criminal malpractice action, the time when the harm is suffered will, in the typical case, be easily identifiable, *i.e.,* the date of sentencing. However, since criminal sanctions are by their nature directed to the criminal defendant's actions, and thus those actions are presumed to be the legal cause of the harm suffered, the date a defendant becomes aware that his counsel may have been responsible for the harm will likely be harder to pinpoint. Nonetheless, it is necessary to establish a point from which the statute of limitations period will commence. The appropriate starting point is the termination of the attorney-client relationship, since at that point the aggrieved defendant is aware of the injury (*i.e.,* the conviction), and is on clear notice to investigate any alternate cause of that harm which he believes to exist. In this regard the defendant is not unlike the medical patient who becomes aware of an injury and is then placed on notice to discover its cause. We now resolve the instant cases." *Id.* at 252-53, 621 A.2d at 115-16. (footnotes omitted)

Under this analysis, the statutory period commences as of the date of the harm (usually the date of sentencing) but is tolled through the discovery rule if counsel continues to represent the defendant.

In *Fiorentino v. Rapoport,* 693 A.2d 208 (Pa. Super. 1997) the plaintiff instituted a legal malpractice action against lawyers who had represented the plaintiff and his business partner in the plaintiff's sale of his share of the business to his partner. The plaintiff and his business partner had each owned 50 percent of the stock in a corporation. On January 2, 1986, a stock purchase agreement was finalized and signed under which the buyer acquired control of the corporation. The agreement provided for the seller to receive 120 monthly payments of $9,166.67 per month. For the first 13 months, these payments were made. Thereafter, the buyer said that the corporation could no longer pay the full amount and the parties amended the agreement to reduce the monthly payments to $5,500. On April 5, 1988, the corporation filed for bankruptcy.

On March 28, 1989, the plaintiff filed this malpractice action against the lawyers who represented him in the sale of his share of the corporation. At trial, he established that his former counsel had failed to exercise ordinary skill and knowledge because the stock purchase agreement did not include basic protections that would have prevented the transfer of assets or the bankruptcy of the ongoing business that the buyer acquired.

In its opinion, the Superior Court addressed the defendant-lawyers' argument that the plaintiff's claims were governed by a two-year statute of limitations and the complaint was not timely filed. The Superior Court rejected the defendant-lawyers' argument that the cause of action accrued when they failed to follow the plain-

tiff's instructions to draft a stock purchase agreement in a manner that would protect his right to be paid.

"However, the mere breach of a professional duty that causes only the *threat* of *unrealized* future harm does not suffice to create a cause of action for negligence. . . . Therefore, the negligent drafting of the stock purchase agreement could not vest a torts claim against the lawyers who prepared it unless or until one of the parties to that agreement acted under color of the agreement to harm the interests of the other party. As long as Mr. Converse [buyer] continued to make the payments specified in the stock purchase agreement, Mr. Fiorentino suffered no economic harm. Thus, the torts claims could not have accrued against cross-appellants before February of 1987, when the parties agreed to reduce payments, but may have occurred as late as February 1988 when Mr. Converse ceased making any payments." *Id.*, 693 A.2d at 220. (citation omitted)

Reed Smith contends that the case of *Robbins & Seventko Orthopedic Surgeons Inc. v. Geisenberger*, 449 Pa. Super. 367, 674 A.2d 244 (1996), supports its position that the cause of action accrued when Spang became aware of the conduct that allegedly constituted Reed Smith's breach of its professional obligations. In the *Robbins* case in the 1970s, the defendant law firm prepared and filed an employee pension plan with the Internal Revenue Service on behalf of the Robbins medical practice. In 1983, the IRS informed the Robbins medical practice that the pension plan had failed to qualify and that deductions made to it in 1976, 1977, 1978, and 1979 were disallowed. Through a new counsel, the Robbins medical group filed an administrative appeal with the IRS. In 1986, the IRS agreed to accept an amendment to the plan for 1978 and 1979. The Robbins medical group believed that for the 1976 and

1977 years, it could also correct the problem through an amended plan. In January 1988, it was advised by new counsel that it was not possible to amend and resubmit the plan. The Robbins medical group sued in December 1988. The defendant law firm raised the statute of limitations as a defense.

The defendant law firm argued that the statute began to run on May 4, 1983, this being the date the IRS notified the Robbins medical group that the deductions to the pension plan were disallowed. The Robbins medical group, on the other hand, contended that the statute of limitations was tolled during their administrative appeal of the IRS notification.

The court ruled in favor of the defendant law firm. It held that Pennsylvania has never adopted the position that the statute of limitations in a legal malpractice action is tolled until appeals of the underlying claim have been exhausted.

The *Robbins* opinion does not address the arguments that Reed Smith raises in the present proceedings because in *Robbins,* the defendant law firm did not argue that the statute of limitations commenced as of the date of counsel's alleged breach of their professional duty. The defendant law firm prevailed through an argument supported by prior case law that the harm is realized prior to the exhaustion of the appeal process.

Reed Smith relies on the following statement within the *Robbins* opinion:

"In Pennsylvania, the occurrence rule is used to determine when the statute of limitations begins to run in a legal malpractice action. Under the occurrence rule, the statutory period commences upon the happening of the alleged breach of duty. *Bailey v. Tucker*, 533 Pa. 237, 251, 621 A.2d 108, 115 (1993). An exception to this rule is the equitable discovery rule, which will

be applied when the injured party is unable, despite the exercise of due diligence, to know of the injury or its cause. *Pocono Raceway v. Pocono Produce Inc.*, 503 Pa. 80, 85, 468 A.2d 468, 471 (1983)." *Id.* at 372-73, 674 A.2d at 246.

This citation to *Bailey v. Tucker* refers to a portion of the *Bailey v. Tucker* opinion that I have previously cited which states that "the statutory period commences at the time the harm is suffered or, if appropriate, at the time the alleged malpractice is discovered." *Id.* at 252, 621 A.2d at 115. (footnote omitted) Also see, the *Fiorentino* opinion where the court said:

"In Pennsylvania, the occurrence rule is used to determine when the statute of limitations begins to run. *Robbins & Seventko v. Geisenberger*, 449 Pa. Super. 367, 372, 674 A.2d 244, 246 (1996). Under the Pennsylvania occurrence rule, the statutory period commences when the harm is suffered, or if appropriate, at the time an alleged malpractice is discovered. *Bailey v. Tucker*, 533 Pa. at 252, 621 A.2d at 115." *Id.* at 219.

In the present case, Spang did not sustain any economic harm until the federal court initially ruled that the surplus pension funds which Spang held should be returned to the plan and distributed to the plan participants.[3] The Benson report and recommendation were filed on June 30, 1994 and this lawsuit was commenced on June 6, 1996, so it does not matter whether the initial ruling is the date on which Judge Donald Lee entered an order setting damages in the amount of $6,919,001 or the earlier date on which Magistrate Judge Kenneth Benson filed his report and recommendation

---

3. The *Robbins* opinion and the cases on which it relies prevent Spang from arguing that Spang had not sustained any economic harm as long as appeals of the district court ruling were pending.

recommending the entry of a summary judgment in favor of plaintiff.

From the date on which Reed Smith initially represented Spang until the date of the federal court ruling, Spang continued to control the pension plan and the surplus funds in the pension plan after its termination. As of late 1988, Spang only knew that a federal court might or might not require Spang to return the surplus pension assets to the plan for distribution to the plan participants. There was uncertainty concerning the fact of damages until the federal court ruled in favor of the union and the pension participants. Until this ruling, Spang was in the same position as Mr. Fiorentino. There was only the possibility that in the future it might lose the benefits that it presently enjoyed (in this case the surplus funds in its possession rather than monthly payments). Consequently, under the principle that the breach of a professional duty causing the threat of future harm not yet realized does not create a cause of action for negligence, Spang's cause of action against Reed Smith did not accrue prior to the federal district court's ruling.

Reed Smith's next argument is that Spang sustained economic losses as soon as the union and the plan participants instituted the federal court litigation. At that time, Spang began paying counsel fees to defend these lawsuits.[4]

However, Spang is not attributing its costs of defense in the underlying action to Reed Smith's breach of

---

4. In its new matter, Reed Smith refers only to Spang's knowing of its potential loss of the surplus pension assets of $6.9 million as of August 29, 1989, if not earlier. The pleadings do not refer to any counsel fees which Spang incurred in defending the underlying federal litigation. However, at oral argument, Spang did not challenge Reed Smith's statements that Spang had incurred counsel fees in the underlying federal litigation. Consequently, I will address this argument at this time.

its professional obligations. Spang's claims in this lawsuit are limited to the benefits that it would have obtained if Reed Smith had exercised ordinary skill and knowledge.[5]

Furthermore, Reed Smith's argument fails because of the case law which does not permit a lawsuit based on a breach of a professional duty to be brought against an attorney until the client "suffers appreciable harm as a consequence of his attorney's negligence." *Ammon v. McCloskey, supra* at 257, 655 A.2d at 552, quoting *Schenkel v. Monheit*, 266 Pa. Super. 396, 399, 405 A.2d 493, 494 (1979), quoting *Budd v. Nixen, supra*, 98 Cal. Rptr. at 852-53, 491 P.2d at 436-37. Until the ruling of the federal district court, it was not certain whether Spang had sustained any economic harm from the representation that Reed Smith provided. It is possible, for example, that the federal court would have ruled that under the language of the October 17, 1981 shutdown agreement and of the amended pension plan,

---

5. There is not an obvious legal basis to support a claim to recover the costs of defense. When the union asserted that the plan participants were entitled to the surplus funds, Spang could have turned over the funds to the plan participants and within the next two years instituted a professional negligence action against Reed Smith for failure to protect its interests. Spang, instead, could choose to defend the suit on the ground that the language of the shutdown agreement, along with the provisions of a properly amended pension plan, were adequate to give legal effect to Spang's intent and understanding that this amended pension plan became the controlling plan document, vesting in Spang the right to receive any surplus pension assets upon termination of the pension plan. If Spang prevailed, this would be the end of the matter; if Spang did not prevail, Spang would then look to Reed Smith to pay the damages that Spang suffered as a result of Reed Smith's failure to protect Spang's interests. It is not clear why the counsel fees incurred in the unsuccessful defense of a claim that Spang elected to defend may be recovered from Reed Smith.

Spang was entitled to any surplus funds. The opinion may have concluded that the Reed Smith attorney's failure to correct statements made at the October 21, 1981 proceeding which inaccurately described the agreement was irrelevant because the clear language of the agreement controls. In this instance, Spang could not look to Reed Smith for payment of counsel fees because Reed Smith had no duty to provide defense costs for a lawsuit in which it was determined that the agreement which Reed Smith drafted protected Spang's interests.

In this case, Reed Smith contends that Spang's cause of action for negligence accrued at the time the underlying federal litigation was instituted in late 1988. Apparently, Reed Smith also contends that Spang's causes of action included both the anticipated costs of defending the underlying federal court action and the amount of any verdict that would be rendered against Spang in this underlying litigation.

The federal court did not make any substantive rulings on plaintiff's claims until June 30, 1994. A final judgment setting damages was not entered until March 30, 1995.

If in early 1989 Spang had instituted a malpractice action against Reed Smith in this court seeking anticipated costs of defense and losses from an anticipated verdict against Spang in the underlying federal court litigation, it is likely that this state court lawsuit would have been scheduled for a trial by late 1990. At a 1990 trial, the jury would be asked to speculate as to what would be the outcome of the federal court litigation. The purpose of requiring actual ascertainable damages prior to filing a legal malpractice action is to prevent this situation.

Under my example, I assume that Reed Smith would not want the Pennsylvania courts to proceed with the

trial of the malpractice claims prior to the resolution of the federal litigation. Its position would be that the malpractice case should be stayed until resolution of the federal court proceedings. However, such a position is inconsistent with the case law that has imposed actual damages as a requirement for instituting a professional negligence action against an attorney in order to prevent lawsuits from being filed against attorneys until actual harm is sustained. Consider, for example, the Superior Court ruling in *Fiorentino v. Rapoport,* that the seller does not have a cause of action against a law firm that drafted an agreement which provides inadequate protection to the seller until financial harm results. The court ruled that it was possible that the buyer would fulfill its obligations throughout the 10-year period, so the seller's lawyers should not be required to defend a claim that they had negligently performed services unless and until their representation caused some actual harm.

For these reasons, I enter the following order of court:

### ORDER

On May 8, 1997, it is hereby ordered that defendant's motion for judgment on the pleadings is denied.